UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JAMES MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:15-cv-00343-SLC |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, *sued as Nancy A. Berryhill*,[1] ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff James Miller appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for disability insurance benefits ("DIB").[2] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Miller applied for DIB in February 2012, alleging disability as of August 8, 2011. (DE 9 Administrative Record ("AR") 21, 162). Miller was last insured for DIB on December 31, 2015 (AR 23), and thus, he must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that he was disabled as of his date last insured in order to recover DIB).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, — F.3d —, 2017 WL 398309 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 12); *see* 28 U.S.C. § 636(c).

The Commissioner denied Miller's application initially and upon reconsideration. (AR 94-97, 104-06). After a timely request, a hearing was held on February 19, 2014, before Administrative Law Judge John H. Metz ("the ALJ"), at which Miller, who was represented by George W. Merkle, MPH, a non-attorney representative (AR 256); a vocational expert, Gail Corn (the "VE"); and two medical experts, Lee Fischer, M.D., and Jack Thomas, Ph.D., testified. (AR 41-88). On March 21, 2014, the ALJ rendered an unfavorable decision to Miller, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of light-exertional jobs in the economy. (AR 21-35). The Appeals Council denied Miller's request for review (AR 1-5), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Miller filed a complaint with this Court on November 16, 2015, seeking relief from the Commissioner's decision. (DE 1). In doing so, Miller asserts that the ALJ erred in four ways: (1) by finding that he did not have a severe mental impairment at step two; (2) by failing to properly consider his obesity in combination with his other impairments; (3) by improperly discounting the credibility of his symptom testimony; and (4) by rejecting the opinion of Dr. Michael Emmons. (DE 13 at 11-25).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Miller was 48 years old (AR 35, 155); had a high school education and had completed a two-year certification from Ivy Tech College in automotive body work (AR 169); and possessed past relevant work experience as a construction

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 416-page administrative record necessary to the decision.

worker, water line worker, machine maintenance worker, and delivery worker (AR 33, 170).

### A. *Miller's Testimony at the Hearing*

At the hearing, Miller, who stated that he was six feet, five inches tall and weighed 250 pounds at the time, testified that he lives with his wife in a one-story home; his wife is employed, but works from home. (AR 45-46, 50, 63, 72-73). He is independent with his self care. (AR 75). His wife performs most of the household tasks, but he does help intermittently by fixing light snacks, washing dishes, and doing laundry; however, he must lie down and rest between tasks to help relieve his back pain. (AR 58-59, 70-72, 74). Miller drives a car several times a week and will run errands for his wife, but otherwise he pretty much stays home. (AR 48, 60-61, 72). He spends his time watching television or reading a book, alternating between sitting in a recliner and lying in bed to help relieve his back pain. (AR 61, 72). He smokes up to three packs of cigarettes a day, but he stopped consuming alcohol six or seven years earlier. (AR 62-63).

When asked why he thought he could not work, Miller cited his back pain, stating that he could maybe work part-time, but that he "can't do it all day" because he needs to lie down every few hours, for a few hours. (AR 68, 76). Miller explained that he has undergone two surgical fusions in his upper spine and that his problem now is in his low back. (AR 66-69). His doctors told him that surgery will not help his low back problem and could even make it worse. (AR 66-69). He rated his back pain as a "four" on a 10-point scale. (AR 61-62). Walking on concrete is particularly painful. (AR 78). He received several spinal injections, but they helped only for a few days. (AR 67). He uses a TENS unit and an inversion table at home, and they provide him some temporary relief. (AR 67). He estimated that he could stand for an hour before needing to

sit or lie down for an hour, could walk about one block, and could lift 10 pounds. (AR 56-57). In the last two years, he started using a cane "when it's slick out," which he thought was about two or three times a week; the cane was not prescribed by a doctor. (AR 46-47). On a bad day, he sometimes takes extra pain medication, but he tries not to because he then runs out of the medication at the end of the month. (AR 64). His medications make him feel "jittery" at times. (AR 56).

Miller also complained of anxiety and depression, reporting that he takes Paxil as prescribed by his family physician. (AR 54, 75). He felt that his depression was associated with his physical problems, in that he gets angry and depressed because he feels that he cannot do anything anymore. (AR 75-76). Thus, his back pain increases his anxiety. (AR 72, 75). He denied any thoughts of harming himself or others, and he did not have hallucinations. (AR 55). He was not under the care of a psychiatrist or psychologist at the time, and he had never been hospitalized for his mental problems. (AR 54).

### B. *Testimony of the Medical Experts*

Dr. Lee Fischer testified at the hearing as a medical expert concerning Miller's physical impairments. (AR 79-82). He identified Miller's physical impairments as chronic low-back pain, lumbar degenerative disc disease, chronic pain syndrome, thoracic spine degenerative disc disease, cervical degenerative disc disease, and chronic narcotic dependence. (AR 80). He opined that Miller's impairments did not meet or equal a listing, including Listing 1.04. (AR 80). He concluded that Miller could lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; sit, stand, and walk for two hours at a time and six hours total in an eight-hour workday; bend, stoop, and climb stairs occasionally, but never crouch, drive, crawl, operate

4

foot controls, or climb ladders, ropes, or scaffolds; and must avoid unprotected heights and wet or uneven surfaces. (AR 80-81). Dr. Fischer indicated that there was no documentation of record to support Miller's need for a cane, need to take rest breaks during the day, or need to elevate his feet. (AR 81-82).

Dr. Jack Thomas testified at the hearing as a medical expert concerning Miller's mental impairments. (AR 82-83). He observed that Miller had been diagnosed with a major depressive disorder, single episode, mild, and had been assigned a Global Assessment of Functioning ("GAF") score of 55.[4] (AR 83). He also noted that a psychiatric review technique by J. Gange, Ph.D., indicated that Miller's mental impairments were non-severe. (AR 83).

### C. *Summary of the Relevant Medical Evidence*

From January 4, 2010, to February 20, 2013, Miller saw Michael Emmons, D.O., for more than 20 visits, largely for his thoracic and lumbar spine, anxiety, and depression. (AR 280-91, 303-33, 372-81, 386, 393-95, 400-08). Abnormal findings on exam included: tissue texture abnormalities over the upper thoracic spine on palpation (AR 331); tenderness of the thoracic and lumbar spine (AR 317, 320, 323, 326-27, 401, 405); right knee pain and swelling (AR 320, 323); abnormal gait (AR 317); restricted and painful range of motion of the spine (AR 318, 374, 377, 380, 401); positive Stork test (AR 318, 374, 377, 380, 405); and positive straight leg raise

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. F. Renee Nevins used a GAF score in assessing Miller, so GAF scores are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

test (AR 318). Miller's weight increased during this time period. He weighed 226 pounds in January 2010, about a year prior to his alleged onset date, but his weight increased to 262 pounds by June 2012, with a BMI of 30.94. (AR 290, 380). In December 2012, Miller weighed 264 pounds and had a BMI of 31.17, and in February 2013, he weighed 267.2 pounds and had a BMI of 32.88. (AR 401, 407). Dr. Emmons's diagnoses included: anxiety disorder, not otherwise specified ("NOS"); cervicalgia; chronic pain; depression; hypertension; lumbar disc degeneration; muscle spasm; nonallopathic lesions of the lumbar and thoracic regions; opioid dependence in combination with another drug, with continuous use; prepatellar bursitis; somatic dysfunction of cervicothoracic and thoracic region; and thoracic strain. (AR 277-78, 280-91, 303-33, 372-81, 386, 393-95, 400-08). Dr. Emmons prescribed multiple medications for Miller's pain, anxiety, and depression and then saw him for medication management; Dr. Emmons also performed osteopathic manipulative treatments on Miller. (AR 280-91, 303-33, 372-81, 386, 393-95, 400-08).

On February 26, 2010, Miller presented to the emergency room for chest pain and difficulty breathing. (AR 258-71). He was anxious, was wheezing, and had a productive cough. (AR 261). A chest X-ray and EKG were normal. (AR 265-70). He did not want any pain medication because he was taking other medications, and he left against medical advice. (AR 259, 261).

On September 29, 2010, Miller saw Dr. Julius Silvidi, a neurosurgeon, for evaluation of his chronic back pain. (AR 299-300). A lumbar MRI confirmed a new small left paracentral disc herniation at the L2-L3 level. (AR 299). An examination was normal. (AR 300). Dr. Silvidi diagnosed chronic thoracic and lumbar back pain and new left L2-3 paracentral disc

6

herniation. (AR 300). He advised against an L2-L3 discectomy, explaining that he did not anticipate that Miller would obtain any relief from surgery. (AR 299). Dr. Silvidi was uncertain of the etiology of Miller's back pain, and thus, he discussed further evaluation through CT scanning. (AR 299).

On June 30, 2012, Miller underwent a physical examination by Dr. Kristina Jenner at the request of the state agency. (AR 339-43). Miller's posture and gait were normal. (AR 341). He could stand on heels and toes, squat, stand up from a squatted position, and get on and off the examination table without difficulty. (AR 341). A joint examination was normal; strength was 5/5 in all major muscle groups. (AR 341). Deep tendon reflexes were normal, and motor and sensory systems were intact. (AR 341). Grip strength and fine motor coordination were normal. (AR 341). Dr. Jenner stated that clinical evidence did not support the need for an ambulatory aid. (AR 341). Dr. Jenner's impression was "back problems," explaining that the exam was notable for mildly decreased range of motion in the cervical and lumbar spine. (AR 341).

On July 2, 2012, Miller underwent a psychological examination by F. Renee Nevins, Ph.D., at the request of the state agency. (AR 345-49). Miller reported feeling sad, angry, and irritable. (AR 345). He also reported daily anxiety; low energy; poor motivation; withdrawal from family and friends; and impaired attention and concentration, which was partially attributable to, and exacerbated by, his pain and physical limitations. (AR 345). He had occasional suicidal thoughts, but no intent or plan; he denied any delusions or hallucinations. (AR 345). He reported a past period of abuse of pain medications and taking more than prescribed, but he no longer does so. (AR 346). He reported limitations in his daily activities due to his physical problems. (AR 348). Miller was cooperative throughout the interview; his

7

affect was flat, partially attributable to pain, and his mood was depressed. (AR 346). No distractibility was noted; his thought processes were logical, and his behavior was goal oriented. (AR 347). His memory was average, except with respect to his recent memory. (AR 349). His skills requiring sustained mental effort and working memory were average to below average. (AR 349). Dr. Nevins opined that Miller may have some mild difficulty attending to a repetitive activity due to mild deficits in recent and working memory and sustained attention. (AR 348). Dr. Nevins further opined that Miller's work pace would be impacted by his mild depression, low energy, and attention concerns. (AR 348). Additionally, Dr. Nevins found that Miller likely maintained the ability to complete most job requirements with minimal supervision. (AR 348). Dr. Nevins diagnosed Miller with major depressive disorder, single episode, mild, and assigned a GAF score of 55. (AR 349).

On July 9, 2012, Dr. A. Dobson, a state agency physician, reviewed Miller's record and concluded that Miller could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards such as unprotected heights. (AR 350-57). Dr. M. Ruiz, another state agency physician, later affirmed Dr. Dobson's opinion. (AR 389).

On July 10, 2012, J. Gange, Ph.D., a state agency psychologist, reviewed Miller's record and concluded that his major depressive disorder was not a severe impairment. (AR 358-70). Dr. Gange opined that Miller had mild limitations in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace. (AR 368). Dr. Gange

8

noted that Miller's limitations in his daily activities were due to his physical pain. (AR 370). Maura B. Clark, Ph.D., another state agency psychologist, later affirmed Dr. Gange's opinion. (AR 388).

On May 21, 2013, a lumbar MRI showed mild degenerative changes. (AR 397-98). The L2-L3 level demonstrated mild disc dehydration; mild diffuse disc bulge; increased posterior epidural fat; small focal left posteriolateral protrusion, extending into the left inferior foramina; and mild foraminal stenosis, left greater than right. (AR 397). The L3-L4 level demonstrated disc dehydration; a diffuse disc bulge; increased posterior epidural fat; mild narrowing of the thecal sac; facet and ligamentous hypertrophy; and bilateral foraminal stenosis. (AR 397). The L4-L5 level demonstrated disc dehydration; a minor disc bulge; facet and ligamentous hypertrophy; bilateral foraminal stenosis; but no significant canal stenosis. (AR 397). The L5-S1 level demonstrated facet and ligamentous hypertrophy and mild right foraminal stenosis. (AR 397).

On October 16, 2013, Miller saw Dr. Isa Canavati, a neurosurgeon, for his chronic low back pain. (AR 410-11). Miller reported worsening back pain, particularly in the last year, that intermittently radiated to his upper thighs. (AR 410). Miller stated that his pain was constant and was aggravated by bending, twisting, or any strenuous activity. (AR 410). He stated that a neurosurgeon had advised him two years earlier to lose weight and to stop smoking. (AR 410). Miller appeared anxious at the exam. (AR 410). Upon examination, he had mild tenderness of the lumbar paraspinal region with restriction of anterior flexion and lateral rotation of the lumbar spine. (AR 410). A straight leg raise test was positive bilaterally at 45 degrees with sciatic nerve tenderness. (AR 410). Gait and station were steady, and a sensory exam was normal.

9

(AR 410). Dr. Canavati reviewed Miller's MRI, which showed "mild degenerative changes at L2-L5 with minimal disc protrusion and borderline stenosis." (AR 411). Dr. Canavati's impression was L2-L5 degenerative disc disease, mild disc protrusion and borderline stenosis; and chronic low back pain syndrome. (AR 411). Based on the examination and MRI findings, Dr. Canavati favored continued conservative treatment and pain management. (AR 411).

On November 15, 2013, Dr. Emmons wrote a letter indicating that Miller "suffers from chronic thoracic and lower back pain" and "needs frequent thoracic manipulations due to his mal-alignment." (AR 412). Dr. Emmons further opined: "[Miller's] pain does not allow him to work at this time." (AR 412).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On March 21, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 21-35). At step one, the ALJ concluded that Miller had not engaged in substantial gainful activity since his alleged onset date. (AR 23). At step two, the ALJ found that Miller had the following severe impairments: degenerative disc disease, chronic pain syndrome, and chronic narcotic dependence. (AR 23).

At step three, the ALJ concluded that Miller did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 27). Before proceeding to step four, the ALJ determined that Miller's symptom testimony was not entirely credible (AR 33) and assigned him the following RFC:

> [T]he claimant has the [RFC] to perform less than the full range of light work . . . . Specifically, he can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. He can sit, stand and walk up to 6 hours each during an 8-hour day, and he can sit, stand and walk each at any one time for up to 2 hours. He can occasionally bend, stoop, kneel, squat, and climb stairs. He should never crouch, crawl, drive commercially, operate foot controls, or climb ladders, ropes or scaffolds. He should avoid all exposure to unprotected heights, unprotected hazards, and wet, uneven surfaces.

(AR 27). The ALJ found at step four that Miller could not perform any of his past relevant work.

(AR 33). At step five, based on the assigned RFC and the VE's testimony, the ALJ concluded that Miller could perform a significant number of light-exertional jobs in the economy, including cashier, hand packager, and assembler. (AR 34). Therefore, Miller's application for DIB was denied. (AR 35).

### C. *The ALJ Failed to Properly Consider Miller's Mental Impairments*

Miller argues that the ALJ erroneously found at step two that he did not have a severe mental impairment, and as a result, the ALJ failed to consider that there are significant functional restrictions related to the mental impairments. (DE 13 at 14). Specifically, Miller contends that the ALJ erred by: (1) improperly concluding that his depression was not a severe impairment at step two; and (2) by failing to separately address his anxiety disorder at step two. Having now considered the issue, the Court agrees that the ALJ's analysis of Miller's mental impairments necessitates a remand of the Commissioner's final decision.

The ALJ's step-two determination is a threshold analysis that requires the claimant to show that he has at least one severe impairment. *See Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) ("[I]t is quite apparent that severity is merely a threshold requirement."). If the claimant has one or more severe impairments, the five-step analysis will continue, with the ALJ considering the combined effect of all of the claimant's impairments without regard to whether any one impairment, if considered separately, would be of sufficient severity. 20 C.F.R. § 404.1523; *see Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [the claimant's] impairments was severe, the ALJ needed to consider the aggregate effect of the entire constellation of ailments . . . ." (internal quotation marks, citation, and emphasis omitted)); *see also Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

13

Here, the ALJ found at step two of the five-step sequential analysis that Miller's depression was not severe. (AR 24-27). The ALJ then applied the special technique for evaluating mental limitations described in 20 C.F.R. § 1520a, concluding that Miller had mild restrictions in activities of daily living; mild limitations in social functioning; and mild limitations in maintaining concentration, persistence, or pace. (AR 24-27). Although the ALJ considered Miller's depression to be not severe, the ALJ found that he had several other severe impairments: degenerative disc disease, chronic pain syndrome, and chronic narcotic dependence. (AR 23). Therefore, the ALJ proceeded to step three and properly continued the sequential evaluation process.

Considering that the ALJ's severity analysis at step two is merely a threshold finding, Miller's challenge to the ALJ's consideration of his mental impairments at step two is more aptly phrased as a challenge to the RFC, as the ALJ ultimately incorporated *no* mental limitations in the RFC. (AR 27). That is, what Miller really seems to be arguing is that the ALJ failed to account for his mental limitations when crafting the RFC at step four. *See Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *22 (N.D. Ill. Nov. 18, 2011) (rephrasing the claimant's step-two argument to be that the ALJ erred by not including her mild mental limitations found at step two into the RFC).

The RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the

adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545(a)(3). Thus, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are not considered severe. 20 C.F.R. § 404.1545(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

Here, after finding at step two that Miller's mental impairments were not severe, there is no evidence that the ALJ later considered Miller's mental impairments when analyzing the RFC, other than to say that "[h]is mental impairments have been discussed above." (AR 28). This is error, as "[a]fter a 'not severe' finding at step two, the special technique requires the ALJ to assess the mental impairment in conjunction with the individual's RFC at step four." *Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013) (citing 20 C.F.R. § 404.1520a(d)(3)).

Therefore, even if the ALJ was correct at step two in finding that Miller's mental impairments were not severe (and the Court is not saying that the ALJ was correct in doing so), the ALJ *still* erred by failing to consider the effect of those mild mental limitations during his RFC analysis at step four. *See Simon-Leveque v. Colvin*, No. 15 C 10049, 2017 WL 168182, at *5-6 (N.D. Ill. Jan. 17, 2017) (collecting cases that remanded the ALJ's decision where the ALJ found mild limitations in activities of daily living, social functioning, or concentration, persistence or pace at step two, but then failed to incorporate these limitations into the RFC analysis at step four); *Dross-Swart v. Astrue*, 872 F. Supp. 2d 780, 795 (N.D. Ind. 2012) (remanding case where the ALJ found mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace, but failed to incorporate them into the RFC analysis); *Muzzarelli*, 2011 WL 5873793, at *23 (remanding case where the ALJ's language

15

"fails to clarify the degree to which the RFC expresses the functional limitations found under the special technique" (citation omitted)); *Kowsenda v. Astrue*, No. 08 C 4732, 2009 WL 958542, at *5 (N.D. Ill. Apr. 2, 2009) (remanding case where the ALJ found mild limitations in concentration, persistence, or pace, but the limitation was omitted from the ALJ's questions to the VE). SSR 96-8p makes clear that mental limitations determined at step two under the special technique are not a substitute for an RFC finding. *See* SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996) ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . .").

In fact, at the end of his step-two finding, the ALJ expressly acknowledged that the special technique was not a substitute for the RFC finding. (AR 27). Nevertheless, the ALJ failed to adequately adhere to the procedure set forth in SSR 96-8p when analyzing the RFC at step four. At the end of his step-two analysis, the ALJ merely stated: "Therefore, the following [RFC] assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." (AR 27). "Courts have remanded cases where an ALJ relied on language identical to that used at the end of Step 2 in this case because it fails to clarify the degree to which the RFC expresses the functional limitations found under the special technique." *Muzzarelli*, 2011 WL 5873793, at *23 ("It is unclear what the ALJ meant by saying that the RFC 'reflects' his Step 2 findings concerning [the claimant's] mild impairments."); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("But [this sentence at the end of step two] was not enough, because the combined impact of the impairments must be considered throughout the

16

disability determination process." (citations and internal quotation marks omitted)). The ALJ's reasoning requires a remand "because the ALJ failed to explain how his Step 2 discussion of [Miller's] restrictions in activities of daily living, social functioning, and concentration are 'reflected' in the RFC itself." *Muzzarelli*, 2011 WL 5873793, at *23. "If the ALJ believed that the mild limitations in these functional areas did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that [the Court] can follow the basis of his reasoning." *Id*. (citing *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005)).

"While a mild, or even a moderate, limitation in an area of mental functioning does not *necessarily* prevent an individual from securing gainful employment, the ALJ must still affirmatively *evaluate* the effect such mild limitations have on the claimant's RFC." *Simon-Leveque*, 2017 WL 168182, at *5 (citation omitted); *see Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) ("A failure to fully consider the impact of non-severe impairments requires reversal." (citing *Golembiewski*, 322 F.3d at 918)). Here, Dr. Nevins observed that Miller may have some difficulty attending to repetitive activity due to mild deficits in memory and sustained attention, and that his work pace would be impacted by his mild depression, irritability, low energy, and attention concerns. (AR 348). Dr. Gange found that Miller had mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and Dr. Gange's opinion was affirmed by Dr. Clark. (AR 368, 388). The ALJ also found in his special technique that Miller had mild mental limitations. (AR 25-26). The ALJ erred by failing to evaluate these mild limitations when assigning the RFC at step four.

The ALJ did explain that he "evaluated the medical opinions in making the [RFC] determination." (AR 36). The ALJ opted to assign "great weight" to the opinion of Dr. Thomas,

17

the medical expert who briefly testified at the hearing about Miller's mental impairments. (AR 36). But Dr. Thomas actually said very little in his testimony. (AR 82-83). He essentially acknowledged that Dr. Nevins diagnosed Miller with a major depressive disorder, single episode, mild, and assigned him a GAF score of 55, and that Dr. Gange found Miller's mental impairment to be non-severe. (AR 83). Dr. Thomas, however, did not testify about Miller's mental limitations. (AR 82-83). As such, the ALJ cannot rely on Dr. Thomas's testimony to rehabilitate his failure to consider Miller's mild mental limitations when assigning the RFC at step four.

In sum, by failing to address Miller's mental limitations after step two, the ALJ in crafting the RFC did not build a "logical bridge from the evidence to [his] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 594 (7th Cir. 2002) (alteration in original) (citation and internal quotation marks omitted). Accordingly, the ALJ's decision will be remanded for reconsideration of Miller's anxiety and depression at step two and for incorporation of Miller's mental impairments into the RFC at step four in accordance with SSR 96-8p.

### D. Upon Remand, the ALJ Should Also Address the Evidence of Miller's Obesity

Miller also argues that the ALJ erred by failing to consider his obesity in accordance with SSR 02-1p. Indeed, the ALJ never mentions Miller's weight or obesity in his decision.

According to clinical guidelines outlined in SSR 02-1p, a BMI of 30.0 or above is described as "obesity." SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002). Here, Dr. Emmons's records reflect that in June 2010—about one year prior to Miller's alleged onset

18

date—Miller weighed 262 pounds. (AR 290). By June 2012, however, Miller weighed 262 pounds and had a BMI of 30.94. (AR 380). In December 2012, Miller weighed 264 pounds and had a BMI of 31.17. (AR 407). And in February 2013, Miller weighed 267 pounds and his BMI was 32.88. (AR 401). Thus, the record reflects objective evidence of obesity from at least June 2012 through February 2013.[6]

"According to SSR 02-1p, the ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (citing *Clifford*, 227 F.3d at 873). "[T]he ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)).

Although Miller did not claim obesity as an impairment, the evidence of record should have "alerted" the ALJ that Miller may have "had another relevant impairment that could contribute to the cumulative effect" of his degenerative disc disease. *Clifford*, 227 F.3d at 872 ("The ALJ, rather than blind himself to this condition . . . , should have considered the weight issue with the aggregate effect of [the claimant's] other impairments." (citation omitted)). Several Seventh Circuit cases have criticized ALJs for failing to consider a claimant's obesity in combination with their degenerative disc disease. *See Goins v. Colvin*, 764 F.3d 677, 681 (7th

---

[6] The Commissioner argues that Miller testified at the hearing in February 2014 that he weighed 250 pounds, which falls below the obesity standard. (AR 46). However, the Court observes that Miller reported his weight as 250 pounds on the adult disability report dated May 23, 2014 (AR 168), but just a few weeks later, Dr. Emmons recorded Miller's weight as 262 pounds and a BMI of 30.94 (AR 380). This suggests that Miller's reporting of his own weight may have been a conservative estimate. Miller's weight as documented at his medical visits, however, constitutes objective medical evidence.

Cir. 2014) (remanding case where the ALJ neglected the claimant's obesity, noting that while obesity is not disabling in itself, "it is an added handicap for someone who has degenerative disc disease"); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (remanding case where the ALJ failed to consider the effect of the claimant's obesity on her degenerative disc disease).

Therefore, while "a failure to explicitly consider the effects of obesity may be harmless error" in certain circumstances, *Prochaska*, 454 F.3d at 736 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)), the ALJ is encouraged to explicitly address the evidence of Miller's obesity in accordance with SSR 02-1p upon remand.[7]

## V.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Miller and against the Commissioner.

SO ORDERED.

Entered this 21st day of April 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[7] Because a remand is warranted based on the ALJ's consideration of Miller's mental impairments, the Court need not reach Miller's remaining arguments.